UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _3/31/18_

IN RE: CANNAVEST CORP.
SECURITIES LITIGATION

**MEMORANDUM**
**OPINION & ORDER**

14 Civ. 2900 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

      This is a federal securities law class action brought on behalf of investors who purchased the common stock of CannaVest between May 20, 2013 and April 14, 2014 (the "Class Period"). The Consolidated Complaint alleges violations of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5.

      Defendants CannaVest, Michael Mona, Jr., Bart P. Mackay, Theodore R. Sobieski, and Edward A. Wilson (the "CannaVest Defendants") have moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 81) Defendant Stuart Titus has likewise moved to dismiss under Rule 12(b)(6). (Dkt. No. 108)[1] The CannaVest Defendants argue that Plaintiffs have not pled facts establishing (1) loss causation; (2) a strong inference of scienter; or (3) a claim for control person liability against the individual Defendants. (Def. Br. (Dkt. No. 81)) Titus contends that he cannot be held responsible for any misstatements made by CannaVest, and that Plaintiffs have not pled facts sufficient to establish (1) scienter; (2) a market manipulation claim; or (3) a control person liability claim. (Titus Br. (Dkt. No. 109))

      For the reasons stated below, the Court concludes that Plaintiffs have adequately alleged material misstatements and omissions. The misstatements and omissions claim against

---

[1] Although the CannaVest Defendants' motion to dismiss is also brought on behalf of Michael Mona, III, he is not named as a defendant in the Consolidated Complaint.

Mackay, Sobieski, and Titus will be dismissed, however, because Plaintiffs have not alleged – under the "group pleading doctrine" – that these Defendants were actively involved in the day-to-day management of CannaVest.

As to Plaintiffs' market manipulation claim, the Court concludes that Plaintiffs have not alleged market activity. Accordingly, Plaintiffs market manipulation claim will be dismissed as to all Defendants.

Finally, as to control person liability, Plaintiffs have not pled facts demonstrating that Sobieski controlled CannaVest, and have likewise not pled facts demonstrating that Titus was a "culpable participant." Accordingly, Plaintiffs' Section 20(a) claim against Sobieski and Titus will be dismissed.

Defendants' motions to dismiss will otherwise be denied.

## BACKGROUND

I.   FACTS[2]

A.   **Parties**

Defendant CannaVest is a publicly traded Delaware corporation whose shares are listed on the over-the-counter ("OTC") Bulletin Board under the symbol "CANV." (Consol. Cmplt. (Dkt. No. 61) ¶ 12) CannaVest's primary business is the development, marketing, and sale of consumer products containing industrial hemp-based compounds, including the hemp plant extract cannabidiol. (Id. ¶ 20)

Defendant Michael Mona, Jr. became president, treasurer, and secretary of CannaVest on November 26, 2012. (Id. ¶ 13.) On January 28, 2013, Mona became the sole

---

[2] Unless otherwise noted, the following facts are drawn from the Consolidated Complaint and are presumed true for purposes of resolving Defendants' motions to dismiss. See Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

Board member of CannaVest, and remained so until March 15, 2013, when three additional directors were appointed to CannaVest's board. (Id.) On July 25, 2013, he resigned as treasurer and secretary and was appointed chief executive officer. (Id.) Prior to joining CannaVest, Mona was a consultant to Medical Marijuana, Inc., and during the Class Period he retained a 4% stake in that company. (Id.)

Defendant Bart P. Mackay is the majority owner of CannaVest. (Id. ¶ 14) He became a CannaVest director on March 14, 2013. (Id. ¶ 27)

Defendant Stuart Titus is the chief executive officer of Medical Marijuana, Inc. (Id. ¶ 17) Prior to the Class Period, Titus owned a 7.1% stake in CannaVest. Between January and March 2014, Titus sold CannaVest stock he had bought for a nickel at prices ranging from $40.76 to $166.17 a share, for a total of $7 million. Titus served as a consultant and advisor to CannaVest, and he provided the financing for a group of purchasers to buy 99.7% of CannaVest's stock in November 2012, including the interest acquired by Mackay. (Id. ¶¶ 17, 22)

Defendants Edward A. Wilson and Theodore R. Sobieski became CannaVest directors on March 14, 2013. (Id. ¶ 27) Wilson is the president of Wilson & Company, a Las Vegas accounting firm. (Id. ¶ 84)

**B.**   **CannaVest's Formation**

CannaVest's corporate predecessor – Foreclosure Solutions, Inc. – was incorporated on December 9, 2010 in Texas. (Id. ¶ 21) Foreclosure Solutions was in the business of "provid[ing] information on pre-foreclosure and forecasted residential properties to homebuyers and real estate professionals on its website." (Id.) The company was not able to secure financing for its business plan, however. (Id.)

On November 16, 2012, entities controlled by Mackay (Mai Dun Limited, LLC and Mercia Holdings, LLC) and Titus (General Hemp, LLC and Banburgh Holdings, LLC)

3

acquired 6,979,000 shares of Foreclosure Solutions – 99.7% of its outstanding stock – for

$375,000. (Id. ¶ 22) Titus loaned the purchase price to the buying entities pursuant to the terms

of individual promissory notes. (Id. ¶ 22) On January 29, 2013, the company changed its name

to CannaVest. (Id. ¶ 23)

That same day, CannaVest purchased the assets of PhytoSphere Systems, LLC, a

subsidiary of Medical Marijuana, Inc. These assets were purchased for $35 million in cash or

CannaVest stock at CannaVest's sole discretion. (Id. ¶ 3) CannaVest announced the acquisition

in a February 12, 2013 press release:

> On December 31, 2012, we entered into an Agreement for Purchase and Sale of
> Assets (the "Purchase Agreement") with PhytoSPHERE Systems, LLC, a
> Delaware limited liability company ("PhytoSPHERE"), whereby the Company
> acquired certain assets of PhytoSPHERE in exchange for an aggregate payment of
> $35,000,000, payable in five (5) installments of either cash or common stock of the
> Company, in the sole discretion of the Company. . . .
>
> The Purchase Agreement requires payment as follows: (a) $4,500,000 on or before
> January 31, 2013; (b) $6,000,000 on or before March 30, 2013; (c) $8,000,000 on
> or before June 30, 2013; (d) $10,000,000 on or before September 30, 2013; and
> $6,500,000 on or before December 31, 2013. For any installments paid by the
> issuance of stock, the number of shares of stock issuable by the Company is
> determined by reference [to] the closing price of our common stock on the day
> prior to issuance. The price is subject to a "collar," whereby in no event will the
> shares issuable pursuant to the Purchase Agreement be priced at more than $6.00
> per share, and in no event will the shares be priced at less than $4.50 per share.

(Id. ¶ 25)

Medical Marijuana, Inc. announced the sale of PhytoSphere on March 1, 2013.

(Id. ¶ 31) Medical Marijuana had acquired an interest in PhytoSphere in April 2012 for $2.5

million. (Id. ¶ 26) Throughout the Class Period, both CannaVest and Medical Marijuana, Inc.

issued a number of press releases regarding PhytoSphere. (Id. ¶¶ 33-41)

In its 2013 Form 10-K, CannaVest reported that it had "accounted for the

acquisition of the assets of PhytoSphere Systems, LLC in accordance with the Accounting

Standards Codification ("ASC") Topic 805, Business Combinations ("ASC Topic 805")" (id. ¶ 56),[3] as required by Generally Accepted Accounting Principles ("GAAP").[4]

According to Plaintiffs, CannaVest "utilized the acquisition (purchase) method [of accounting] prescribed under certain provisions of ASC [Topic] 805." (Id. ¶ 57) Under this approach, "the assets acquired and liabilities assumed are initially recorded at their respective fair market values. The excess of the purchase price over the fair value of the net assets acquired is recognized and reported as an asset called goodwill." (Id.) This accounting treatment requires the following steps: "[i]dentifying the acquirer"; "[d]etermining the acquisition date"; "[r]ecognizing and measuring the identifiable assets acquired, the liabilities assumed, and any noncontrolling interest in the acquiree"; and "[r]ecognizing and measuring goodwill or a gain from a bargain purchase." (Id. ¶ 59) (emphasis omitted).

On March 14, 2013, CannaVest's Board added three new directors: Mackay, Sobieski, and Wilson. With these additions, the Company's Board now had four directors. (Id. ¶ 27) As of April 12, 2013, CannaVest had five employees. (Id. ¶ 28)

**C.    SEC Filings and Press Releases**

On May 14, 2013, CannaVest announced that it had terminated its relationship with its independent auditor – Turner Stone & Company – and retained Anton Chia, LLP as its new auditor. (Id. ¶ 79)

---

[3] According to the Consolidated Complaint, the Financial Accounting Standards Board ("FASB") approved the ASC "as the single source of authoritative U.S. accounting and reporting standards, other than guidance issued by the SEC." (Id. ¶ 44) "The Codification does not change GAAP, it introduces a new structure – one that is organized in an easily accessible, user-friendly online research system." (Id. ¶ 46 (emphasis removed))

[4] According to the Consolidated Complaint, "[GAAP] are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time." (Id. ¶ 43)

On May 20, 2013, CannaVest filed its Form 10-Q for the first quarter of 2013. (Id. ¶ 88)  The Company reported intangible assets of $33,656,833 and revenues of $1,275,000. (Id. ¶ 89)

On June 20, 2013, CannaVest issued a press release concerning its first quarter 2013 results.  The press release states: "The company's financial performance over the first quarter of 2013 was driven by the sale of raw hemp product to third parties. . . . [W]e are buying and selling to third parties substantial inventories of raw hemp product, which generated our income of $337,941 in the first quarter of 2013." (Id. ¶ 92)

On August 13, 2013, CannaVest filed its Form 10-Q for the second quarter of 2013. (Id. ¶ 96)  The Company reported $26,998,125 in goodwill and $4,995,895 in net intangible assets. (Id. ¶ 97)  This Form 10-Q contained no related party disclosures. (Id. ¶ 98)

On November 14, 2013, CannaVest filed its Form 10-Q for the third quarter of 2013. (Id. ¶ 102)  The Company reported $4,466,666 in intangible assets and an impairment to goodwill of $26,998,125. (Id. ¶ 103)  This impairment brought CannaVest's goodwill to a net carrying value of $0. (Id. ¶ 106)

On April 3, 2014, CannaVest filed a Form 8-K stating that it had misreported its financial condition in its Form 10-Qs for the first, second, and third quarters of 2013, and that it intended to issue corrective disclosures for those quarters. (Id. ¶ 116)  In trading that day, shares of CannaVest stock fell $7.30 per share, or more than 20%, to close at $25.30 per share. (Id. ¶ 117)

On April 14, 2014, CannaVest filed an Amended Form 8-K in which it disclosed, inter alia, that it had overstated the value of goodwill associated with the PhytoSphere transaction, and that it had overvalued its revenues for the first quarter of 2013 by $192,625, or

approximately 15%. (Id. ¶ 119) CannaVest's stock fell $4.49 per share that day, or 19.5%, to close at $18.51 per share. (Id. ¶ 120)

On April 24, 2014, CannaVest filed re-stated financial statements for the first, second, and third quarters of 2013. As to the first quarter of 2013, CannaVest reported that it had overstated its intangible assets in connection with the PhytoSphere transaction by $28,079,488, and overstated its revenue by $192,625. (Id. ¶ 94) The restatement also notes that

> [t]he amount previously reported as due to PhytoSPHERE pursuant to the Agreement as of March 31, 2013 was reported as $30,500,000. This was calculated based on a Transaction amount of $35,000,000 and a set per share price between $4.50 and $6.00 under the Agreement. In reviewing the price that the Company's common stock was trading at during the year, subsequent to March 31, 2013, management determined that using a per share price to value the Transaction may not represent a true measure of the fair market value of the Transaction and that obtaining a valuation of the assets purchased from PhytoSPHERE would be required in order to determine the fair market value of the business acquired. Accordingly, management determined that the valuation of $8,020,000 represented a more reliable measure of the fair value of the Transaction.

(Id.) The restatement also discloses that "100% of the Company's revenue of $1,082,375 for [the first quarter of 2013] . . . [was] from affiliates of Medical Marijuana, Inc., a stockholder of the Company." (Id. ¶ 95)

As to the second quarter of 2013, the restatement discloses that (1) CannaVest had overstated its intangible assets in connection with the PhytoSphere transaction by $1,837,387, and (2) that 100% of the Company's $107,683 in revenue in the second quarter was from affiliates of Medical Marijuana, Inc. (Id. ¶¶ 100-01)

With respect to the third quarter of 2013, the restatement discloses that CannaVest overstated the intangible assets it acquired in connection with the PhytoSphere transaction by $904,666, and that Cannavest understated goodwill in connection with this transaction by

$1,855,512. (Id. ¶ 106)  The Company also disclosed that 100% of its $163,662 in revenue in the third quarter was from affiliates of Medical Marijuana, Inc.  (Id. ¶ 107)

The Consolidated Complaint was filed on September 14, 2015.  (Dkt. No. 61)

## DISCUSSION

## I.  **LEGAL STANDARDS**

### A.  **Rule 12(b)(6) Standard**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pleaded "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne. Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." Iqbal, 556 U.S. at 678.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner,

Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)).

### B.    Heightened Pleading Standard for Securities Fraud Complaints

"A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards." In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 383 (S.D.N.Y. 2012). First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This requirement "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (citing Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004)). Accordingly, a securities fraud complaint based on misstatements must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach, 355 F.3d at 170 (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b). The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. § 78u-4(b)(2)(A); see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976))). "To qualify as 'strong' within the intendment of

[the PSLRA][,] . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

## C. Exchange Act Claims

Plaintiffs bring claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, and Section 20(a), 15 U.S.C. § 78t(a). The Consolidated Complaint alleges both false and misleading statements, and deceptive and manipulative conduct. (See Consol. Cmplt. ¶¶ 134-44; see also Pltf. Opp. (Dkt. No. 79) at 15 ("Plaintiff alleges both false and misleading statements in violation of Rule 10b-5(b) and deceptive and manipulative conduct in violation of Rules 10b[-]5(a) and (c).")) [5]

To state a material misstatement or omission claim under Section 10(b) and Rule 10b-5, a plaintiff must "allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Comme'ns, Inc. v. Sharr Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007) (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)).

---

[5] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

To state a claim for market manipulation, Plaintiff must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." Id. at 101 (citing Schnell v. Conseco, Inc., 43 F. Supp. 2d 438, 448 (S.D.N.Y. 1999); Cowen & Co. v. Merriam, 745 F. Supp. 925, 929 (S.D.N.Y. 1990)).

Here, "[t]hese two claims are interrelated[,] . . . because Plaintiff's market manipulation claim[] involve[s] a failure to disclose," In re Merrill Lynch Auction Rate Sec. Litig., 851 F. Supp. 2d 512, 524 (S.D.N.Y. 2012), aff'd sub nom. Louisiana Pac. Corp. v. Merrill Lynch & Co., 571 Fed. App'x 8 (2d Cir. 2014), "[a]nd 'nondisclosure is usually essential to the success of a manipulative scheme.'" Id. (quoting Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477 (1977)).

## II. MISSTATEMENTS OR OMISSIONS CLAIM

### A. Misstatement or Omission of a Material Fact

#### 1. Alleged misstatements or omissions

Misstatements or omissions are material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 448 (1976)). "At the pleading stage, a plaintiff satisfies the material requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000) (citing Basic, 485 U.S. at 231). "[A] complaint may not properly be dismissed pursuant to Rule 12(b)(6) . . . on the ground that the alleged misstatements or omissions are not material unless

they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

Here, Plaintiffs allege that Defendants engaged in a scheme to mislead the investing public concerning the value of CannaVest's common stock and to profit thereby. (Consol. Cmplt. (Dkt. No. 61) ¶ 2) Defendants' fraudulent scheme was assisted by Medical Marijuana, Inc. and its "subsidiaries, affiliates, officers and directors and others, all of whom profited or stood to profit from the scheme." (Id.) Plaintiffs further allege that the acquisition of PhytoSphere was part of the fraudulent scheme. (Id. ¶ 3) In furtherance of the fraudulent scheme, Defendants issued materially false or misleading statements regarding the value of the PhytoSphere transaction and CannaVest's financials. (Id. ¶ 4) More specifically, Defendants (1) "misrepresented and materially overstated the value of the PhytoSphere transaction and the amount of its intangible assets and goodwill acquired thereby"; (2) overstated the amount of CannaVest's revenues for the first quarter of 2013; (3) misrepresented the source of CannaVest's revenues for the first, second, and third quarters of 2013 by "failing to disclose that 100% of CannaVest's revenues during the first three quarters of 2013 were generated from sales to [Medical Marijuana, Inc.,] a related party"; (4) failed to disclose that co-defendant Michael Llamas, who was under indictment for fraud, was participating behind the scenes in the management of the Company; and (5) misrepresented that CannaVest's financials complied with GAAP. (Id. ¶ 4)

The Court concludes that Plaintiffs have adequately alleged misstatements of material facts with respect to the PhytoSphere transaction. Plaintiffs have alleged that CannaVest overstated the value of the PhytoSphere assets by approximately $27 million (the difference between the $35 million purchase price and the fair market value of the transaction as

later disclosed).  Plaintiffs' allegations are supported by, <u>inter alia</u>, CannaVest's amendments to numerous SEC filings.

For example, in its Form 10-Q for the first quarter of 2013, CannaVest reported intangible assets of $33,656,833.  (<u>Id.</u> ¶ 89)  On April 24, 2014, however, CannaVest amended this 10-Q to report that the Company had overstated its intangible assets in connection with the PhytoSphere transaction by $28,079,488.  (<u>Id.</u> ¶ 94)  CannaVest's amendment to its 10-Q also disclosed that – while the fair market value of the PhytoSphere transaction had been originally reported as $35 million – the Company had concluded that "a more reliable measure of the fair value of the Transaction" was $8,020,000.  (<u>Id.</u> ¶ 94)

Similarly, as to the Form 10-Q for the second quarter of 2013, CannaVest filed an amended Form 10-Q disclosing that it had overstated intangible assets in connection with the PhytoSphere transaction by $1,837,387.  (<u>Id.</u> ¶ 100)  And in its Form 10-Q for the third quarter of 2013, CannaVest had reported $4,466,666 in intangible assets and an impairment to goodwill of $26,998,125.  (<u>Id.</u> ¶ 103)  On April 24 2014, CannaVest amended this 10-Q to disclose that it had overstated the $4,466,666 of intangible assets acquired in connection with the PhytoSphere transaction by $904,666, and that it had understated goodwill in connection with the PhytoSphere transaction by $1,855,512.  (<u>Id.</u> ¶ 106)

Defendants argue that the effect of these misstatements was not material, because when CannaVest issued its Form 10-Q for the third quarter of 2013, it disclosed impaired goodwill of $26,998,125, resulting in a net carrying value of $0.  (Def. Br. (Dkt. No. 81) at 12; <u>see also</u> Consol. Cmplt. (Dkt. No. 61) ¶ 103).

As an initial matter, such "truth-on-the-market" defenses are "intensely fact-specific and [are] rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." Ganino, 228 F.3d at 167.

In any event, the reported impairment does not significantly undermine the materiality of Plaintiffs' allegations. Plaintiffs contend that Defendants never believed that the PhytoSphere transaction had a fair market value of $35 million. (Consol. Cmplt. (Dkt. No. 61) ¶ 31, at 16-17 (quoting press article stating that the parties to the transaction set "an arbitrary price of $35 million, and said it was all going to be paid in [CannaVest] stock and not cash. But [CannaVest] was a shell company that had no operation, so the whole thing looks fraudulent. . . . How did they come to $35 million?"); id. ¶¶ 4, 139) Although Defendants announced an impairment of the goodwill associated with this transaction in CannaVest's Form 10-Q for the third quarter of 2013, they did not reveal at that time that the value of the transaction as originally announced was fraudulently set. This Court finds that there is a "substantial likelihood that the disclosure of the omitted fact" – that the announced $35 million price was never the true value of the PhytoSphere transaction and that Defendants never believed that the transaction had a value of $35 million – "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); see Ganino, 228 F.3d at 167 ("[C]orrective information must be conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged

misstatements." (quoting In re Apple Comput. Sec. Litig., 886 F.2d 1109, 1116 (9th Cir. 1989))).[6]

Plaintiffs have also adequately alleged that CannaVest over-reported its revenue for the first quarter of 2013. CannaVest originally reported revenues of $1,275,000 for that quarter (Consol. Cmplt. (Dkt. No. 61) ¶ 89), but in its April 24, 2014 restatement announced that the correct figure was $192,625 less, a difference of slightly more than 15%. (Id. ¶ 94) The 15% difference is sufficient to establish materiality at the pleading stage. See Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 719 (2d Cir. 2011) (applying a "presumptive 5% threshold of materiality").

Plaintiffs have also adequately alleged that CannaVest misrepresented that 100% of its revenues during the first three quarters of 2013 came from third parties, and did not disclose that the entities that were the source of the revenue were affiliated with Medical Marijuana, Inc., a CannaVest stockholder. For example, in a June 20, 2013 press release, CannaVest stated that the "company's financial performance over the first quarter of 2013 was driven by the sale of raw hemp product to third parties. . . . [W]e are buying and selling to third parties substantial inventories of raw hemp product, which generated our net income of $337,941 in the first quarter of 2013.'" (Id. ¶ 92 (emphasis added)) Moreover, CannaVest's 10-Qs for the second and third quarters of 2013 made no related party disclosures. (Id. ¶¶ 98, 104)[7] In its April 24, 2014 restatement, CannaVest disclosed that "100% of the Company's revenue of

---

[6] Because Plaintiffs' alleged disclosure violations are sufficient, Defendants' argument that the Santa Fe doctrine – which bars Section 10(b) claims for allegations that "constitute no more than internal corporate mismanagement," Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 479 (quoting Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971)) – is unavailing.

[7] CannaVest's 10-Q for the first quarter of 2013 disclosed a promissory note transaction with Roen Ventures, a company in which Mona held a 50% stake. (Id. ¶ 90)

$1,082,375 for [the first quarter of 2013 was] . . . from affiliates of Medical Marijuana, Inc., a stockholder of the Company." (Id. ¶ 95) Likewise, as to the second quarter of 2013, CannaVest reported in its April 24, 2014 restatement that 100% of its revenue of $107,683 was from affiliates of Medical Marijuana, Inc. (id. ¶ 101), and its restatement as to the third quarter of 2013, CannaVest reported that 100% of its revenue of $163,662 was from affiliates of Medical Marijuana, Inc. (Id. ¶ 107) The fact that 100% of CannaVest's revenue for a nine-month period in 2013 came from CannaVest shareholders, rather than outside buyers, satisfies the materiality prong for pleading purposes.

Finally, Plaintiffs have alleged that CannaVest represented that its financial statements complied with GAAP when they did not. (Id. ¶ 4) As in In re CitiGroup Inc. Bond Litigation, 723 F. Supp. 2d 568 (S.D.N.Y. 2010), "Plaintiffs' allegation – that defendants represented that their financial statements had been compiled in compliance with GAAP when, in fact, defendants failed to comply with GAAP in several, significant respects – identifies an untrue statement of material fact." Id. at 594. Moreover, as in In re Citigroup, Plaintiffs' allegation "is then backed by specific factual allegations, identifying each GAAP provision allegedly violated, and in what manner those provisions were violated." Id. For example, the Consolidated Complaint pleads that the ASC states that "[i]nformation about transactions with related parties that would make a difference in decision making shall be disclosed so that users of the financial statements can evaluate their significance." (Id. ¶ 74 (quoting ASC Topic 850-10-05-10) (emphasis removed)). Considered together with Plaintiffs' allegations concerning related party transactions, Plaintiffs have properly alleged that CannaVest violated GAAP by failing to disclose these related party transactions. (Id. ¶¶ 74, 77)

16

Plaintiffs further allege that CannaVest's 2013 Form 10-K reports that the Company had "accounted for the acquisition of the assets of PhytoSphere Systems, LLC in accordance with the Accounting Standards Codification ('ASC') Topic 805, Business Combinations ('ASC Topic 805'), as required by Generally Accepted Accounting Principles ('GAAP')." (Id. ¶ 56) The Consolidated Complaint points out, however, that CannaVest filed a Form 8-K on April 3, 2014, announcing that CannaVest had "determined that the purchase price and the allocation of the purchase price [of PhytoSphere] as previously disclosed . . . were not in accordance with accounting princip[les] generally accepted in the United States ('GAAP')." (Id. ¶ 53) Accordingly, Plaintiffs have properly alleged that the PhytoSphere transaction was not accounted for in accordance with GAAP.

## 2. **Responsibility for Alleged Misstatements and Omissions**

Having determined that material misstatements or omissions were made, the next question is which Defendants may properly be held responsible for making them. In Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135 (2011), the Supreme Court held that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right." Id. at 142.

Here, the SEC filings in question – Form 10-Qs – were issued by CannaVest and signed by Mona. (Id. ¶¶ 88, 96, 102) The June 20, 2013 press release – which announced first quarter 2013 earnings – was issued by CannaVest and contained statements by Mona. (Id. ¶ 92) Accordingly, both CannaVest and Mona can be held responsible for statements in these materials.

### a.     **Group Pleading Doctrine**

Plaintiffs also rely, however, on the "group pleading" doctrine (see Consol. Cmplt. (Dkt. No. 61) ¶¶ 93, 99, 105, 109; Pltf. Opp. (Dkt. No. 79) at 15), "which allows a plaintiff to rely on a presumption that written statements that are 'group-published,' e.g., SEC filings and press releases, are statements made by all individuals 'with direct involvement in the everyday business of the company.'" City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp., 875 F. Supp. 2d 359, 373 (S.D.N.Y. 2012) (quoting Camofi Master LDC v. Riptide Worldwide, Inc., 10 Civ. 4020 (CM), 2011 WL 1197659, at *6 (S.D.N.Y. Mar. 25, 2011)).

The group pleading doctrine is "'extremely limited in scope,'" id. at 373 (quoting Camofi Master LDC, 2011 WL 1197659, at *6), and is most commonly applied to "high-ranking officers" in a corporation. Watson v. Riptide Worldwide, Inc., 11 Civ. 874 (PAC), 2013 WL 417372, at *6 (S.D.N.Y. Feb. 4, 2013) (group pleading doctrine applied to defendants – one of whom served as corporate secretary, senior vice president, and later executive president, and the other as chief financial officer; such individuals "are subject to the group pleading doctrine due to their role as 'senior officers,' which 'qualif[ies] them as "corporate insiders with active daily roles"'" (quoting In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., 398 F. Supp. 2d 244, 247, 250 (S.D.N.Y. 2005)); Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 180 (S.D.N.Y. 2006) (group pleading is "'extremely limited in scope, applying only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions'" (quoting In re GeoPharma Inc. Sec. Litig., 399 F. Supp. 2d 432, 445 (S.D.N.Y. 2005) (internal quotation omitted)).

"[M]ost judges in this District have continued to conclude that group pleading is alive and well [after Janus]." City of Pontiac, 875 F. Supp. 2d at 374. As Judge Rakoff explained,

> [Janus] addressed only whether third parties can be held liable for statements made by their clients. Its logic rested on the distinction between secondary liability and primary liability, and has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability. It is not inconsistent with Janus Capital to presume that multiple people in a single corporation have the joint authority to "make" an SEC filing, such that a misstatement has more than one "maker."

Id. at 374 (emphasis in original) (citing Janus Capital, 564 U.S. at 142-43). This Court has previously held that the group pleading doctrine survives Janus, see In re Nevsun Res. Ltd., 12 Civ. 1845 (PGG), 2013 WL 6017402, at *11 n.5 (S.D.N.Y. Sept. 27, 2013), and the Court is still of that view. Accordingly, there is a presumption that those with "direct involvement in the everyday business of [CannaVest]" made the statements at issue.

### b.    Application

Defendant Mackay was appointed a director of CannaVest on March 14, 2013 (Consol. Cmplt. (Dkt. No. 61) ¶ 14), is the majority owner of CannaVest (id.), and is the "creat[or]" of CannaVest. (Id. ¶ 30, at 12) The group pleading doctrine "may apply to outside directors who 'although almost by definition [are] excluded from the day-to-day management of a corporation, can fall within the group pleading presumption when, by virtue of their status or a special relationship with the corporation, . . . [their] access to information [is] more akin to a corporate insider.'" In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432, 445 (S.D.N.Y. 2005) (quoting In re Indep. Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 767-68 (S.D.N.Y. 2001), abrogated on other grounds by In re Initial Public Offering Sec. Litig., 241 F.

Supp. 2d 281, 352 (S.D.N.Y. 2003)); see also In re ShengdaTech, Inc. Sec. Litig., 11 Civ. 1918 (LGS), 2014 WL 3928606, at *10 (S.D.N.Y. Aug. 12, 2014) (same).[8]

A large ownership share is relevant to the analysis of whether an individual has a "special relationship" with the corporation, but courts still generally require "a role in the preparation of [misleading statements]," or that the individual "took part in the day-to-day operations" of the corporation. Compare In re GeoPharma, 399 F. Supp. 2d at 445 ("A bare allegation that Jugal Taneja is Chairman of the Board, in the absence of any specific allegation that he played a role in the preparation of the December 1 Release, or otherwise took part in the day-to-day operations of GeoPharma, does not justify applying the group pleading doctrine."), with In re GeoPharma, 411 F. Supp. 2d 434, 452 (S.D.N.Y. 2006) (finding that amended complaint's "allegations of [Taneja's] large ownership share, combined with a consulting agreement that pays him more than any employee of the company, give rise to the inference that he has a sufficient special relationship to GeoPharma to apply the group pleading doctrine"); In re Indep. Energy Holdings, 154 F. Supp. 2d at 768 (plaintiffs alleged that director was a founder of a company, its largest individual shareholder – owning approximately 3.1% of the shares, id. at 749 – and was "significantly involved in the Company's affairs"; court held that director was "more akin to a 'corporate insider' with a special relationship to the Company, rather than an outside director").

Here, the Court concludes that Plaintiffs have not pled facts demonstrating that Mackay either played a role in the preparation of the misleading statements, or had direct

_____

[8] "Outside director" in this context means directors who do not have a management position. See In re GeoPharma, Inc. Sec. Litig., 411 F. Supp. 2d 434, 451 (S.D.N.Y. 2006) (board chairman who held 31% of the company's common stock and who had a consulting contract with the company was an "outside director").

involvement in the day-to-day management of CannaVest. See In re ShengdaTech, 2014 WL 3928606, at *10 (finding that group pleading doctrine did not apply to outside directors; plaintiffs alleged that Mudd was the Chair of the Audit Committee and was an "audit committee financial expert" under SEC rules; that Saidman was a member of the Audit Committee; that Mudd and Saidman held routine meetings with auditors and management in connection with their role as Audit Committee members; that Mudd and Saidman were members of the Compensation Committee and Nominating and Corporate Governance Committee; and that Mudd and Saidman had "extensive knowledge" of ShengdaTech; court held that group pleading doctrine did not apply, because "the Complaint fails to allege facts tending to show that Defendants Mudd and Saidman, who are outside directors, exceeded those roles and became involved in the everyday business of ShengdaTech"). Plaintiffs' generic and conclusory allegation that Mackay (and the other individual Defendants) "did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false in misleading" (id. ¶ 146) is not sufficient. See City of Pontiac, 875 F. Supp. 2d at 374 ("Plaintiff's conclusory pleading that each defendant had 'ultimate authority' over the statements is clearly insufficient to plead [that an executive vice president] made these statements.").

The same reasoning applies to Defendant Sobieksi. Plaintiffs allege that he was a Director of CannaVest (Consol. Cmplt. (Dkt. No. 61) ¶ 15), and that he influenced and controlled CannaVest's decision-making. (Id. ¶ 146) These allegations are not sufficient for application of the group pleading doctrine.

As to Defendant Wilson, Plaintiffs allege that he was a CannaVest Director from March 14, 2013 to October 31, 2013 (id. ¶ 16), and that – prior to becoming a director – he was

responsible for the valuation of the PhytoSphere transaction. (Id. ¶ 69) While this valuation would have been completed before Wilson became a director – the transaction was announced on February 12, 2013 (id. ¶ 5) and Wilson became a director on March 14, 2013 (id. ¶ 16) – Plaintiffs allege that Wilson was handling "accounting functions" at CannaVest. (Id. ¶ 83) These allegations are sufficient to demonstrate at the pleading stage that Wilson had direct involvement in the management of CannaVest.

As to Defendant Titus, the Consolidated Complaint pleads that he is the chief executive officer and controlling shareholder of Medical Marijuana, Inc. (Id. ¶ 17) He provided the financing for the acquisition of CannaVest, and he owns 7.1% of CannaVest stock. He also served as a consultant and advisor to CannaVest, and he was paid $30,000 for his services during 2013. (Id.) These facts are not sufficient to demonstrate that Titus had "ultimate authority" over the SEC filings and press releases at issue, see Janus, 564 U.S. at 142, or that the group pleading doctrine could properly be applied to him. Even assuming arguendo that he had influence or the power to "suggest what to say," see id. – given that he financed Mackay's acquisition of CannaVest, owned 7.1% of CannaVest's stock, and was a consultant to CannaVest – he did not have "ultimate authority" over the Company's SEC filings and press releases, because he was neither a director nor a corporate officer of CannaVest. See City of Pontiac, 875 F. Supp. 2d at 374.

The Court concludes that the Consolidated Complaint's factual allegations provide a basis for holding CannaVest, Mona, and Wilson liable for the statements in CannaVest's SEC filings and press releases, but do not provide such a basis as to Mackay, Sobieski, and Titus.

**B.**     **Scienter**

To establish scienter, the PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) "[T]o qualify as a 'strong inference,' the inference of scienter must be 'more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" ECA & Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (quoting Tellabs, 551 U.S. at 314).

"Plaintiffs may allege scienter by either (1) showing the defendants' motive and opportunity to perpetrate fraud, or (2) alleging 'strong circumstantial evidence of conscious misbehavior or recklessness.'" Iowa Pub. Emps.' Ret. Sys. v. Deloitte & Touche LLP, 919 F. Supp. 2d 321, 331 (S.D.N.Y. 2013) ("IPERS") (emphasis in original) (quoting In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 384 (S.D.N.Y. 2007)). "At least four circumstances may give rise to a strong inference of the requisite scienter:  where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor.'" ECA, 553 F.3d at 199 (quoting Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000)).

"[I]f Plaintiffs cannot make [a] 'motive' showing, then they [can] raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." Id. at 198-99 (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)). "'The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

individual allegation, scrutinized in isolation, meets that standard.'" Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp., 874 F. Supp. 2d 341, 357 (S.D.N.Y. 2012) (quoting Tellabs, 551 U.S. at 322-23).

### 1. Motive and Opportunity to Perpetrate Fraud

Motive to commit fraud entails "'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" Novak, 216 F.3d at 307 (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)). A plaintiff may not rely on "motives possessed by virtually all corporate insiders," however, but instead must allege "that defendants benefitted in some concrete and personal way from the purported fraud." Id. at 307-08. Thus, in alleging motive, "'a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold.'" Kalnit, 264 F.3d at 139 (2d Cir. 2001) (quoting Shields, 25 F.3d at 1130). Similarly, "the desire for the corporation to appear profitable," as well as "the desire to keep stock prices high to increase officer compensation," are "insufficient motives." Id. at 139 (quoting Novak, 216 F.3d at 307-08)

Although ownership and sale of stock may satisfy the motive and opportunity prong, courts in this District have required "suspicious or unusual" activity in connection with stock sales. See In re Bear Stearns Companies, Inc. Sec., Derivative, and ERISA Litig., 763 F. Supp. 2d 423, 499 (S.D.N.Y. 2011) ("[u]nusual or suspicious insider trading activity supports an inference of scienter"); In re Prestige Brands Holding, Inc., 5 Civ. 6924 (CLB), 2006 WL 2147719, at *5 (S.D.N.Y. July 10, 2006) ("[W]here each Defendant retained over 80% of the stock that he owned, Plaintiffs[] failed to demonstrate that the stock sales were suspicious and unusual . . . ."); see also Acito v. IMCERA Grp., Inc., 47 F.3d 47, 54 (2d Cir. 1995) ("While unusual insider trading activity during the class period may permit an inference of bad faith and

scienter, plaintiffs have failed to establish that Kennedy's stock sales were 'unusual.'" (citing <u>In re Apple Comput. Sec. Litig.</u>, 886 F.2d 1009, 1117 (9th Cir. 1989)).

Here, as to Mona, Plaintiffs have sufficiently alleged opportunity and motive to commit fraud. The Consolidated Complaint alleges that in or about March 2014, Mona was attempting to sell 10 million shares in CannaVest stock. (Consol. Cmplt. (Dkt. No. 61) ¶ 31) The requirement that the stock sale be "suspicious or unusual" is satisfied by the allegation that the shares Mona was attempting to sell were "restricted shares [that] couldn't be traded publicly for another six months." (<u>Id.</u>) Mona's alleged improper attempt to sell his restricted shares suggests that he may have been concerned that CannaVest's stock price would drop as a result of disclosures that would be made in April 2014.

In sum, the Consolidated Complaint pleads facts sufficient to demonstrate motive and opportunity as to Defendant Mona.

### 2. Conscious Misbehavior or Recklessness

#### a. Applicable Law

A plaintiff may also satisfy the scienter requirement by "alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." <u>Kalnit</u>, 264 F.3d at 138 (quoting <u>Acito,</u> 47 F.3d at 52). Where "motive is not apparent[,] . . . the strength of the circumstantial allegations must be correspondingly greater." <u>Id.</u> at 142 (quoting <u>Beck v. Mfrs. Hanover Trust Co.</u>, 820 F.2d 46, 50 (2d Cir.1987)).

Plaintiffs pursuing a "conscious misbehavior or recklessness" theory must allege conduct that is, "'at the least . . . highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" <u>Id.</u> (quoting <u>Honeyman v. Hoyt</u>, 220 F.3d 36, 39 (2d Cir. 2000)). Such claims "typically" survive motions to dismiss

when based on specific allegations demonstrating "'defendants' knowledge of facts or access to information contradicting their public statements.'" Id. (quoting Novak, 216 F.3d at 308). A failure "to check information [defendants] had a duty to monitor" may also give rise to a strong inference of recklessness. Novak, 216 F.3d at 311; see also Nathel v. Siegal, 592 F. Supp. 2d 452, 464 (S.D.N.Y. 2008) (same). In such circumstances, "'defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.'" Kalnit, 264 F.3d at 142 (quoting Novak, 216 F.3d at 308).

Where improper accounting is alleged, establishing conscious misbehavior or recklessness "in the securities fraud context [requires] far 'more than a misapplication of accounting principles.'" IPERS, 919 F. Supp. 2d at 333 (quoting SEC v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)). "At the pleading stage, the reckless conduct alleged by plaintiffs must be, 'at a minimum, "highly unreasonable[,] . . . represent[ing] an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"" Id. at 333-34 (quoting Tabor v. Bodisen Biotech, Inc., 579 F. Supp. 2d 438, 449 (S.D.N.Y. 2008) (quoting In re Carter-Wallace, Inc., Sec. Litig., 220 F.3d 36, 39 (2d Cir. 2000))) (alterations in original). "Such recklessness cannot be shown with [accounting standards] violations alone." In re China Organic Sec. Litig., 11 Civ. 8623 (JMF), 2013 WL 5434637, at *10 (S.D.N.Y. Sept. 30, 2013).

**b.    Analysis**

The statements of CW-1 strongly support an inference of scienter as to Mona and Wilson. As alleged in the Consolidated Complaint, CW-1 was "a financial consultant who joined the Company in May 2013, [and who] knew 'right away' that CannaVest had misapplied its accounting and [that] the Company's financial statements would need to be restated." (Consol. Cmplt. (Dkt. No. 61) ¶ 65) CW-1 worked at the Company "from about May 2013 until

CannaVest's audit was completed the following spring of 2014." (Id.) During that time, CW-1 "worked directly with Defendant CEO Mona, Jr., and reported frequently to the CannaVest Board of Directors, including Defendant Director Wilson, a CPA." (Id.)

According to CW-1, the errors in the Company's accounting were obvious:

> As soon as CW 1 started working with CannaVest, CW 1 said, he/she recognized immediately that a restatement of the Company's financial statements would be needed due to the way goodwill had been booked and as a result of unreliable valuation methods used for same. Specifically, immediately upon viewing the most recent quarterly statement (2013 Q1), CW 1 noticed that CannaVest was improperly amortizing goodwill from the PhytoSphere acquisition, which CW 1 recognized as improper accounting. However, CW 1 said, the specific restatement could not be known until a full audit had been conducted. "I knew we were going to have to get a re-evaluation on the assets, but I didn't want to restate with incomplete information," CW 1 said.

(Id. ¶ 66)

According to the Consolidated Complaint,

> CW 1 said the discussion about the need to restate began after CW 1's arrival in May 2013 and that it took place between CW 1 and Defendant CEO Mona, Jr. and the members of the Company's Board of Directors. . . . CW revealed that there were extensive discussions among top management, the auditors and counsel as to whether or not the Company would have to restate its financials. "I remember hearing, 'Oh, it makes us look like we don't know what we're doing,'" CW 1 said, regarding the discussions with Defendant CEO Mona, Jr. and the Board of Directors.

(Id. ¶68)

The Consolidated Complaint also pleads facts demonstrating that CannaVest had poor internal controls over a sustained period of time. For example, when CannaVest replaced its auditing firm on May 14, 2013, the outgoing firm informed Mona and the Company of deficiencies in its internal controls:

> [W]e identified a deficiency in the Company's internal control that we consider to be a deficiency and material weakness. . . . The Company's accounting management . . . consists of one person holding the offices of Chief Executive Officer and Chief Financial Officer. The general ledger accounting and financial statement preparation functions have been outsourced to independent accounting

and/or consulting firms due to the lack of technical accounting qualifications and SEC reporting and disclosure experience by accounting management. In addition, after the change of control and accounting management, the independent accounting firm to which the accounting and financial statement preparation functions were contracted also did not have the technical accounting qualifications or experience with SEC reporting and disclosure matters.

(Id. ¶ 79) CannaVest also reported material weaknesses in its internal controls over financial reporting in its Form 10-Qs for the first, second, and third quarters of 2013, and in its 2013 Form 10-K. (Id. ¶¶ 80-81)

Courts in this District have repeatedly held that weak internal controls will support an inference of scienter. See, e.g., In re OSC Sec. Litig., 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) ("A lack of adequate internal controls may support the inference of scienter."); Hall v. The Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) ("[T]he Company admitted that it had material weaknesses in its internal controls – weaknesses probative of scienter."); In re Veeco Instruments, Inc. Sec. Litig., 235 F.R.D. 220, 232 (S.D.N.Y. 2006) ("[A]s this court has recognized, a failure to maintain sufficient internal controls to avoid fraud is sufficiently indicative of scienter . . . .").

These allegations are sufficient to demonstrate scienter as to Defendant Mona.

As to Defendant Wilson, he was appointed a Director of CannaVest on March 14, 2013 (Consol. Cmplt. (Dkt. No. 61) ¶ 27), approximately two months before CW-1 started her work at the Company. As a member of the Board, it is a reasonable inference from the Consolidated Complaint that he would have been made aware in May 2013, by CW-1, of the need for CannaVest to restate its financials. It is also a fair inference that Wilson, as a Board member, would have been made aware of the May 14, 2013 letter from the outgoing auditor concerning the deficiencies in the Company's internal financial controls.

The scienter evidence against Wilson involves more than his position on CannaVest's board, however. Wilson is a certified public accountant (id. ¶ 16), and is the president of his own accounting firm, Wilson & Company. (Id. ¶ 84) The Consolidated Complaint alleges – based on information supplied by CW-1 – that Wilson & Company oversaw the initial transaction with PhytoSphere and the valuation of goodwill, and improperly amortized the goodwill. (Id. ¶ 85) Accordingly, Wilson was in a position to directly influence the accounting treatment of the PhytoSphere transaction.

The alleged egregious accounting treatment and lack of internal controls support a strong inference of scienter against Wilson, given that he was a certified public accountant with his own accounting firm, and played a direct role in CannaVest's accounting, particularly as to the PhytoSphere transaction.

The Court concludes that Plaintiffs have pled sufficient facts to establish scienter as to both Mona and Wilson. Because Plaintiffs have sufficiently alleged scienter as to CannaVest directors and a corporate officer, scienter may be imputed to CannaVest. See In re Vivendi Universal, S.A. Sec. Litig., 765 F. Supp. 2d 512, 543 (S.D.N.Y. 2011) ("When the defendant is a corporate entity, the law imputes the state of mind of the employees or agents who made the statement(s) to the corporation.")

**C.  Loss Causation**

**1.  Applicable Law**

In Dura Pharmaceuticals Inc. v. Broudo, 544 U.S. 336 (2005), the Supreme Court held that a plaintiff in a private securities fraud action must prove a causal connection between plaintiff's alleged loss and the defendant's fraudulent conduct. Dura Pharmaceuticals, 544 U.S. at 345-46. Plaintiffs typically demonstrate loss causation by identifying a disclosure of the fraud that caused a drop in the price of their stock.

## 2.   **Analysis**

Here, Plaintiffs have sufficiently alleged loss causation.  On April 3, 2014, CannaVest filed a Form 8-K announcing that it had misreported its financial condition in Form 10-Qs for the first, second, and third quarters of 2013.  (Id. ¶ 116)  That same day, the Company's shares fell $7.30, or more than 20%, to close at $25.30 per share.  (Id. ¶ 117)  On April 14, 2014, CannaVest filed an amended Form 8-K, providing more detail concerning its restatements.  (Id. ¶ 119)  That day, CannaVest's stock fell $4.49 per share, or 19.5%, to close at $18.51 per share.  (Id. ¶ 120)

Defendants argue that the alleged misstatements regarding the value of the PhytoSphere transaction cannot support loss causation, because CannaVest had already written down the value of the goodwill associated with that transaction to zero.  (See Def. Br. (Dkt. No. 81) at 17-18)  As discussed earlier, however, there is a difference between a legitimate – but mistaken – valuation of a transaction at $35 million, and a fraudulent over-valuation of that same transaction at the outset.  A reasonable investor may view these two scenarios quite differently, because only one scenario involves fraud.  The Court concludes that the impairment to goodwill announced by CannaVest does not undermine Plaintiffs' loss causation arguments.

Defendants also contend that the price of CannaVest stock was volatile during the period of the corrective disclosures, and that accordingly the price declines are attributable to broader market forces and not to the corrective disclosures.  (See Def. Br. (Dkt. No. 81) at 19-20)  In Acticon AG v. China North East Petroleum Holdings Ltd., 692 F.3d 34 (2d Cir. 2012), however, the Second Circuit concluded that such arguments are typically not appropriate to resolve on a motion to dismiss:

> The [district] court correctly noted that the fact that the price rebounded does not,
> at the pleading stage, negate the plaintiff's showing of loss causation.  The
> [district] court reasoned that determining why a stock's price rebounded after an

initial drop requires the court to consider "a competing theory of causation and raises factual questions not suitable for resolution on a motion to dismiss." We agree with the [district] court's analysis on this point. The defendants here argue that the rebound in share price demonstrates that the market was unfazed by the alleged corrective disclosures, so the disclosures were unrelated to Acticon's ultimate loss. At this stage in the litigation, we do not resolve why the NEP's share price rose after its initial fall and instead, drawing all reasonable inferences in favor of Acticon, assume that the price rose for reasons unrelated to its initial drop.

Id. at 39-40 (citing Malin v. XL Capital Ltd., 3 Civ. 2001 (PCD), 2005 WL 2146089, at *4 n.5 (D. Conn. Sept. 1, 2005)).

Here, Plaintiffs point to disclosures tied to the alleged misstatements and omissions at issue, and CannaVest's stock price declined after each of these disclosures. These allegations are sufficient to survive a motion to dismiss.

*    *    *    *

To the extent that Plaintiff's Section 10(b) and Rule 10b-5 claims are premised on material misstatements and omissions, (1) CannaVest, Mona, and Wilson's motion to dismiss will be denied; and (2) Defendant Mackay, Sobieski, and Titus's motions to dismiss will be granted.

## III.    MARKET MANIPULATION CLAIM

### A.    Applicable Law

As discussed above, to state a claim for market manipulation, a plaintiff must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." ATSI Communications, 493 F.3d at 101 (citing Schnell v. Conseco, Inc., 43 F. Supp. 2d 438, 448 (S.D.N.Y. 1999); Cowen & Co. v. Merriam, 745 F. Supp. 925, 929 (S.D.N.Y. 1990)).

The Second Circuit has set the following standards for pleading a market manipulation claim:

> A claim of market manipulation . . . can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim. . . . [A] manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants[, however]. . . . General allegations not tied to the defendants or resting upon speculation are insufficient. This test will be satisfied if the complaint sets forth, to the extent possible, "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue."

Id. at 102 (quoting Baxter v. A.R. Baron & Co., 94 Civ. 3913 (JGK), 1995 WL 600720, at *6 (S.D.N.Y. Oct. 12, 1995)) (citations omitted).

As to the nature of the required "manipulative acts," "case law in this circuit and elsewhere has required a showing that an alleged manipulator engaged in market activity aimed at deceiving investors as to how other market participants have valued a security." Id. at 100 (emphasis added). Thus, "a market manipulation claim . . . cannot be based solely upon misrepresentations or omissions. There must be some market activity, such as 'wash sales, matched orders, or rigged prices.'" Id. at 101 (quoting Santa Fe, 430 U.S. at 473)[9] In Lentell v.

---

[9] Plaintiffs contend (Pltf. Opp. (Dkt. No. 111) at 16-22) that Rule 10b-5(a) and (c) reach conduct not described in ATSI Communications. ATSI Communications makes clear, however, that market activity is a necessary component of a market manipulation claim, and that is the claim that Plaintiffs have brought. See Consol. Cmplt. (Dkt. No. 61) ¶¶ 2, 126, 140. To the extent Plaintiffs rely on alternative theories under Rule 10b-5(a) and (c), these theories fail, because Plaintiffs have not alleged conduct separate from the conduct that underlies their material misstatements and omissions claim. See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 277 F. Supp. 3d 500, 519 (S.D.N.Y. 2017) ("'[T]he three subsections of Rule 10b-5 are distinct, and courts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric.'") (quoting In re Smith Barney Transfer Agent Litig., 884 F.Supp.2d 152, 161 (S.D.N.Y. 2012); S.E.C. v. Kelly, 817 F. Supp. 2d 340, 344 (S.D.N.Y.

2011) ("Scheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement.").

Plaintiffs' reliance on an SEC administrative proceeding – In the Matter of Flannery, SEC Release No. 3981, 2014 WL 7145625 (Dec. 15, 2014) – is misplaced. The Commission's decision was vacated by the First Circuit. Flannery v. SEC, 810 F.3d 1 (1st Cir. 2015). Moreover, even after Flannery, courts in this District have continued to require more than misstatements or omissions to support a market manipulation claim. See Sharette v. Credit Suisse Int'l, 127 F. Supp. 3d 60, 77 (S.D.N.Y. 2015) ("[A]llegations of misrepresentations or omissions alone cannot support a claim of market manipulation. ATSI, 493 F.3d at 101. Rather, there must be 'wash sales, matched orders, rigged prices, or some other manipulative act intended to mislead investors by artificially affecting market activity.'" (quoting Cohen v. Stevanovich, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010)).

Plaintiffs also cite to In re Global Crossing, Ltd. Sec. Litig., 322 F. Supp. 2d 319 (S.D.N.Y. 2004), where the court stated that "subsections (a) and (c) [of Rule 10b-5] encompass much more than illegal trading activity: they encompass the use of 'any device, scheme or artifice, or any act, practice, or course of business' used to perpetrate a fraud on investors." Id. at 336 (quoting 17 C.F.R. Part 240.10b-5(a), (c)). In re Global Crossing was decided before ATSI Communications, however.

Plaintiffs also cite IBEW Local 90 Pension Fund v. Deutsche Bank AG, 11 Civ. 4209 (KBF), 2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013), a case premised on a "fraudulent and deceptive scheme" theory of liability. The court found that, "[t]o state a claim that a defendant has engaged in a fraudulent or deceptive scheme in violation of Rule 10b-5(a) and (c), a plaintiff must allege a defendant (1) committed a deceptive or manipulative act, (2) with the requisite scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendant's actions caused the plaintiff's injuries." Id. at *11. Nothing in that recitation undermines the proposition that there must be conduct separate from the conduct that underlies a material misstatements and omissions claim to support a claim under Rule 10b-5(a) or (c). Moreover, the conduct alleged in that case – that defendants originated or acquired residential mortgages, repackaged them into mortgage-backed securities and collateralized debt obligations, and sold the products with knowledge that they carried more risk than they told the market, see id. at *1 – likely constitutes "market activity." The court summarized plaintiffs' claims as follows:

> Plaintiffs allege that defendants engaged in a scheme to defraud investors by increasing short term revenues and inflating Deutsche Bank's stock price by taking mortgages of substandard quality and pooling them into [residential backed mortgage securities (RMBS)] and [collateralized debt obligations (CDOs)]. Those RMBS and CDOs were then sold to investors – generating short term profits, which, in turn, made the stock more attractive. Plaintiffs allege that defendants had specific knowledge of the poor quality of the mortgages underlying the RMBS and CDOs – and that they demonstrated this knowledge by authorizing [Deutsche Bank's top global RMBS trader] to take and expand a

Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005), the Second Circuit likewise makes clear that a market manipulation claim requires more than misstatements or omissions: "[P]laintiffs cast their claims in terms of market manipulation, pursuant to Rule 10b-5(a) and (c). We hold that where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c)." Id. at 177.

## B.    Analysis

Plaintiffs allege that the PhytoSphere transaction was part of scheme to manipulate the market for CannaVest stock and defraud investors. (See id. ¶¶ 2-3) According to CannaVest's February 12, 2013 press release, the terms of the PhytoSphere transaction were as follows:

> On December 31, 2012, we entered into an Agreement for Purchase and Sale of Assets (the "Purchase Agreement") with PhytoSPHERE Systems, LLC, a Delaware limited liability company ("PhytoSPHERE"), whereby the Company acquired certain assets of PhytoSPHERE in exchange for an aggregate payment of $35,000,000, payable in five (5) installments of either cash or common stock of the Company, in the sole discretion of the Company. . . .
>
> The Purchase Agreement requires payment as follows: (a) $4,500,000 on or

---

multi-billion dollar short position on RMBS and CDOs (some number of which were structured and sold by Deutsche Bank). This short position only made sense – and only made money – as the value of the RMBS and CDOs declined. According to plaintiffs, defendants asked [the trader] to provide specific information supporting this short position (that is, why he expected CDOs to decline in value), and such information was provided. In addition, plaintiffs allege that despite knowing that [a Deutsche Bank subsidiary] was engaged in poor lending practices (which were packaged into RMBS and CDOs) they nonetheless repeatedly reassured investors that their credit and lending practices were conservative and being adhered to.

Id. at *13.

Finally, Plaintiffs rely on two out-of-circuit cases – In re Galena Biopharma, Inc., 117 F. Supp. 3d 1145 (D. Ore. 2015), and SEC v. Wealth Strategy Partners, LC, 14 Civ. 2427, 2015 WL 3603621 (M.D. Fla. June 5, 2015). (See Pltf. Opp. (Dkt. No. 111) at 21-22) Because neither of these cases are subject to ATSI Communications' market activity requirement, they are not persuasive here.

before January 31, 2013; (b) $6,000,000 on or before March 30, 2013; (c) $8,000,000 on or before June 30, 2013; (d) $10,000,000 on or before September 30, 2013; and $6,500,000 on or before December 31, 2013. For any installments paid by the issuance of stock, the number of shares of stock issuable by the Company is determined by reference [to] the closing price of our common stock on the day prior to issuance. The price is subject to a "collar", whereby in no event will the shares issuable pursuant to the Purchase Agreement be priced at more than $6.00 per share, and in no event will the shares be priced at less than $4.50 per share.

(Id. ¶ 25)

In support of their market manipulation claim, Plaintiffs quote from an article outlining the alleged manipulative effect of the PhytoSphere transaction:

One reason why CANV shares spiked so high is that Medical Marijuana Inc. sold PhytoSphere "assets" to CannaVest for $35 million (almost exclusively) in CANV shares, a transaction that bolstered both companies' profiles at little actual cost. CannaVest also issued 900,000 of its shares to PhytoSphere as part of that deal. The whole transaction was somewhat like the episode of Beavis and Butthead in which the two teenagers sell all their chocolate bars to each other for the same pair of dollars.

. . . .

In a glowing press release dated March 1, 2013, Medical Marijuana Inc. announced that it was selling its subsidiary PhytoSphere (which processed the hemp paste from abroad) to CannaVest for $35 million in "CANV" shares. It sounded impressive on paper, but CannaVest scarcely had an operation to justify any meaningful valuation of its shares. SEC filings show that CannaVest only had a total of $431 in assets at the time the transaction was announced.

. . . .

Throughout 2013, Medical Marijuana Inc. reported that it was handing off incremental parts of its portfolio company PhytoSphere to CannaVest for piecemeal infusions of $35 million in CannaVest shares. Each new pronouncement gave a momentary jolt to the price of Medical Marijuana Inc. shares, their value inflated by overblown press releases and a cannabis-crazy zeitgeist.

(Id. ¶ 31 (emphasis removed))

As discussed above, the Consolidated Complaint pleads facts demonstrating that Defendants fraudulently overstated the value of the PhytoSphere transaction and that they issued CannaVest stock in furtherance of the alleged fraudulent scheme. (Id. ¶¶ 3-5) The alleged inflated valuation of the transaction sent a false signal to the market about the value of CannaVest stock.

However, as suggested by the examples of "wash sales, matched orders, or rigged prices" listed by the Supreme Court in Sante Fe, 430 U.S. at 475, and repeated by the Second Circuit in ATSI Communications, an asset purchase – standing alone – is an unlikely basis for a market manipulation claim. In any event, Plaintiffs have not alleged sufficient facts to make out such a claim here. Plaintiffs do not allege that the manner in which CannaVest issued the 900,000 shares it used to consummate the PhytoSphere transaction with Medical Marijuana, Inc. was manipulative or deceptive. As the Consolidated Complaint makes clear, Plaintiff's objection to this transaction is that its value was overstated, not that the trading of CannaVest shares in connection the transaction was somehow manipulative. (See Consol. Cmplt. (Dkt. No. 61) ¶¶ 3-4) Misstatements and omissions affect how market participants value a security's stock, of course, but if this effect were alone sufficient to plead a market manipulation claim, virtually all misstatement or omissions claims could be pled as market manipulation claims. The courts' insistence on proof of market activity prevents these two theories of liability from becoming duplicative. Because Plaintiffs have not pled facts demonstrating misconduct beyond misstatements and omissions, under ATSI Communications they have not pled a market manipulation claim.

This analysis has been applied by other courts in this District. For example, in TCS Capital Mgmt., LLC v. Apax Partners, L.P., 6 Civ. 13447 (CM), 2008 WL 650385

(S.D.N.Y. Mar. 7, 2008), TPG and Apax bought TIM Hellas, a subsidiary of Telecom Italia. A

minority shareholder, TCS Capital, was squeezed out by this merger. Id. at *3-9. TCS sued

under both a misstatements and omissions theory and a market manipulation theory:

> Plaintiff allege[d] that defendants Apax and TPG intended to buy out TCS at an
> artificially low price. To accomplish their goal, they allegedly (1) negotiated and
> executed a "secret deal" with Telecom Italia to buy the majority of TIM Hellas stock at a
> price that did not fairly reflect what [TPG and Apax] knew was the true value of the
> company, and (2) implemented a series of "deceptive practices" to conceal their fraud
> and ensure the success of their scheme.

Id. at *22.

In dismissing TCS's market manipulation claim, the court concluded that it was

nothing more than a gussied up misstatements and omissions claim:

> The Telecom Italia deal was not a wash sale or a matched order. Rather, the
> "deception" lies in the alleged failure to disclose the "real terms" of the deal –
> terms that presumably put more money per share in Telecom Italia's pocket than
> the €16.4 that Buyers paid to acquire the stock from Telecom Italia [based on an
> undisclosed royalty agreement].

> As should be apparent, this so-called "deception" is nothing more than a
> reiteration of the misrepresentations and omissions that underlie plaintiff's
> disclosure claim. Plaintiff merely re-labels the alleged misstatements and
> omissions as "manipulative and deceptive conduct." This sleight of hand does not
> magically transform its disclosure claim into a market manipulation claim.

Id.

Here, the claimed deception is CannaVest's alleged fraudulent valuation of the

PhytoSphere transaction at $35 million. But this is the same deception underlying Plaintiffs'

misstatements and omissions claim. While a stock transaction took place in connection with the

PhytoSphere transaction, as is apparent from the court's reasoning in TCS Capital, the fact that

payment is made in stock does not transform what would otherwise be a misstatements and

omissions claim into a market manipulation claim.

Likewise in <u>Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC</u>, 14 Civ. 3251 (JPO), 277 F. Supp. 3d 500 (S.D.N.Y. 2017), plaintiffs alleged improprieties in connection with Och-Ziff's dealings in Africa, including a loan to securing mining rights in Zimbabwe, loans to acquire mines in the Democratic Republic of the Congo, and transactions with Libya's sovereign wealth fund. <u>See id.</u> at 504. Plaintiffs alleged that Och-Ziff (1) covered up bribe payments by miscategorizing them; (2) falsified documents related to bribes; (3) withheld documents requested by regulators; (4) prepared financial statements that reflected incorrect entries, in order to disguise the illegal conduct; (5) continued to benefit from the illegal transactions; and (6) failed to book a reserve in connection with the possibility of a regulatory investigation. <u>Id.</u> at 519. The court found, however, that the asset manager's "misrepresentations or omissions in its public filings are not a proper basis for a scheme liability claim. '[T]he three subsections of Rule 10b-5 are distinct, and courts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric.' Therefore, Och-Ziff's statements about the investigation, Och-Ziff's failure to disclose the then-uncharged conduct, and Och-Ziff's failure to disclose or accrue a loss contingency do not constitute deceptive acts for the purpose of scheme liability." <u>Id.</u> (quoting <u>In re Smith Barney Transfer Agent Litig.</u>, 884 F. Supp. 2d 152, 161 (S.D.N.Y. 2012)). Similarly here, the alleged misrepresentation regarding the value of the PhytoSphere assets – which forms the basis of Plaintiffs' misstatements and omissions claim – is not a proper basis for a market manipulation claim.

Because Plaintiffs have not pled facts demonstrating manipulative market activity,[10] Defendants' motions to dismiss the market manipulation claim will be granted.

---

[10] The only other CannaVest stock transaction cited in the Consolidated Complaint (besides Defendants' sales of their own stock) is as follows: "In June 2014, CannaVest . . . announced

## IV.   CONTROL PERSON LIABILITY

The Consolidated Complaint includes claims for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  A claim for control person liability under Section 20(a) is "necessarily predicated on a primary violation of securities law." Rombach v. Chang, 355 F.3d 164, 177-78 (2d Cir. 2004).  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." ATSI Communications, 493 F.3d at 108. "'[W]hether a person is a "controlling person" is a fact-intensive inquiry, and generally should not be resolved in a motion to dismiss.'" In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007) (quoting CompuDyne Corp. v. Shane, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006)).

As an initial matter, for the reasons explained above, Plaintiffs have sufficiently alleged a Section 10(b) claim against CannaVest.

"Control" for purposes of Section 20(a) means "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1473 (2d Cir. 1996) (quoting 17 C.F.R. Part 240.12b-2)).  Mona and Mackay easily meet this test. Mackay is the creator, majority owner, and a director of CannaVest (Consol. Cmplt. (Dkt. No. 61) ¶¶ 14, 30), while Mona is the chief executive officer, president, and a director of CannaVest. (Id. ¶ 13)

---

that it had disposed of several million shares of KannaLife Sciences, a MARIJUANA MEDICAL, INC. subsidiary, in exchange for a half million shares of CannaVest, which had previously been issued to Phytosphere." (Consol. Cmplt. (Dkt. No. 61) ¶ 32) (emphasis in original).  Plaintiffs have not pled facts demonstrating that this trading was manipulative.

Plaintiffs have also pled control liability as against Wilson. The Consolidated Complaint pleads that Wilson was a director of CannaVest; that he is the president of Wilson & Company, a certified public accounting firm; and that Wilson's company was likely responsible for the audit of the PhytoSphere transaction. (Id. ¶¶ 16, 69) Plaintiffs also allege that Wilson (and the other individual Defendants) "had direct and supervisory involvement in the day-to-day operations of the Company" (id. ¶ 147), and that he had "the power to influence and control, and did influence and control, direct or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading." (Id. ¶ 146) Given that control-person liability is a fact-intensive inquiry, the Court concludes that these allegations are sufficient at this stage.

Plaintiffs also allege that Titus controlled CannaVest. In considering Plaintiffs' Section 20(a) claim against Titus, this court must consider whether Plaintifs have pled facts demonstrating that Titus had "'actual control over the transaction in question.'" In re Alstom SA, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (emphasis in original) (quoting In re Global Crossing, Ltd. Sec. Litig., 2005 WL 1875445, at *3 (S.D.N.Y. Aug. 5, 2005)).

The Consolidated Complaint alleges that Titus is the chief executive officer of Marijuana Medical, Inc. (Id. ¶ 17) Prior to the Class Period, Titus owned a 7.1% stake in CannaVest. He also served as a consultant and advisor to CannaVest in 2013. (Id.) Moreover, Titus provided the financing for the acquisition of CannaVest, including the interest acquired by Mackay. (Id.) Accordingly, Plaintiffs have alleged that Titus played multiple, key roles in the PhytoSphere transaction: he was the chief executive officer of the company whose assets were being acquired, and he provided the financing for Mackay's simultaneous purchase of

CannaVest. The Court concludes that – at this stage of the proceedings – Plaintiffs have alleged facts sufficient to show that Titus was able to influence and control CannaVest.[11]

As to Sobieski, Plaintiffs have not pled facts sufficient to establish control liability. As discussed above, Plaintiffs have pled few facts concerning Sobieski other than that he was a CannaVest director. "'Neither director status nor mere membership on an audit committee, standing alone, is sufficient to demonstrate actual control over a company[, however].'" City of Westland Police & Fire Ret. Sys. v. MetLife, Inc., 928 F. Supp. 2d 705, 720-21 (S.D.N.Y. 2013) (quoting In re Satyam Comput. Servs. Ltd. Sec. Litig., 915 F. Supp. 2d 450, 482 (S.D.N.Y. 2013)).

As to the third element of a Section 20(a) claim – that "the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud," ATSI Communications, 493 F.3d at 108, a plaintiff must plead "particularized facts of the controlling person's conscious misbehavior or recklessness." Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd., 33 F. Supp. 3d 401, 438 (S.D.N.Y. 2014) (emphasis removed) (quoting Lapin v. Goldman Sachs Grp., 506 F. Supp. 2d 221, 246 (S.D.N.Y. 2006). Accordingly, to plead "culpable participation" for purposes of a Section 20(a) claim, a plaintiff must plead facts demonstrating "that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct.'" Id.

---

[11] As Janus makes clear, this Court's finding that Titus did not have "ultimate authority" to "make" the misstatements and omissions at issue does not preclude a finding that Plaintiffs have sufficiently pleaded control as to Titus. The Janus court stressed that these two theories of liability are different. Janus, 564 U.S. at 148 (noting that defendant's theory of Rule 10b-5 liability – based on a "relationship of influence" – would make Rule 10b-5 liability resemble control person liability; "[t]o adopt [defendant's] theory would read into Rule 10b-5 a theory of liability similar to – but broader in application than – what Congress has already created expressly elsewhere [in Section 20(a)]. We decline to do so.")

at 439 (quoting Burstyn v. Worldwide Xceed Grp., Inc., 1 Civ. 1125 (GEL), 2002 WL

31191741, at *8 (S.D.N.Y. 2002)); see also In re ForceField Energy, Inc. Sec. Litig., 15 Civ.

3020 (NRB), 2017 WL 1319802, at *16 (S.D.N.Y. Mar. 29, 2017) ("[T]his Court has

consistently sided with most judges in the District and found that a plaintiff must plead culpable

participation with scienter. The scienter element may be established by pleading either

conscious misbehavior or recklessness." (citation omitted)).

      Plaintiffs have sufficiently pled primary Section 10(b) and Rule 10b-5 violations

against Mona and Wilson. Because Plaintiffs have pled facts sufficient to support an inference

of scienter as to these Defendants, they have necessarily pled facts sufficient to support "culpable

participation." As stated in In re Refco, Inc. Securities Litigation, 503 F. Supp. 2d 611

(S.D.N.Y. 2007),

> the conclusion above that plaintiffs have sufficiently plead scienter as to
> defendants . . . requires the conclusion that plaintiffs have shown culpable
> participation as to those defendants. . . . Courts in this district have reached
> different conclusions as to whether allegations of motive to commit fraud suffice
> to support an allegation of culpable participation where there are insufficient
> allegations to support an inference of knowledge or recklessness. . . . It makes
> little sense, however, to hold that the same facts are sufficient to support a claim
> for primary liability but insufficient to support a claim for control liability. If
> alleged facts raise a strong inference that a defendant acted with scienter as to a
> particular misstatement, those facts must necessarily raise a strong inference that
> the defendant's participation as a control person was culpable. Accordingly,
> culpable participation has been adequately alleged even as to those defendants as
> to whom motive and opportunity, but not recklessness, have been adequately
> alleged.

Id. at 661-62 (citing In re Flag Telecom Holdings, Ltd. Sec. Litig, 308 F. Supp. 2d 249, 273

(S.D.N.Y. 2004); In re Indep. Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 771-72 &

n.23 (S.D.N.Y. 2001))). Similarly here, it would make little sense to hold that Plaintiffs have

pled a primary violation against a defendant but have not adequately pled "culpable

participation" by that same defendant in the same course of conduct.

As to Mackay, the Court concludes that Plaintiffs have sufficiently pled his "culpable participation." As a member of the Board, it is a reasonable inference from the Consolidated Complaint that he would have been made aware in May 2013, by CW-1, of the need for CannaVest to restate its financials. It is also a fair inference that Mackay, as a Board member, would have been made aware of the May 14, 2013 letter from the outgoing auditor concerning the deficiencies in the Company's internal financial controls. These allegations are sufficient to plead "culpable participation" as against Mackay.

The Consolidated Complaint does not, however, adequately allege "culpable participation" as against Titus. Although Plaintiffs have sufficiently alleged a number of material misstatements and omissions based on CannaVest's financial reporting, Plaintiffs have not pled facts demonstrating that Titus was a participant in those misstatements or omissions. Plaintiffs contend that Titus was a paid consultant and advisor to CannaVest (Pltf. Opp. (Dkt. No. 111) at 25 (citing Consol. Cmplt. (Dkt. No. 61) ¶ 17)); that he owned 7.1% of CannaVest's shares (id. (citing Consol. Cmplt. ¶ 17)); that a subsidiary of Medical Marijuana, Inc. was the exclusive master distributor and marketing company for CannaVest (id. (citing Consol Cmplt. ¶¶ 40, 110)); and that Medical Marijuana, Inc. and its affiliates were CannaVest's sole customers during the class period. (Id. (citing Consol. Cmplt. ¶¶ 95, 101, 107) Plaintiffs further contend that Medical Marijuana, Inc. issued numerous press statements "touting CannaVest and its recently acquired assets of PhytoSphere." (Id. (citing Consol. Cmplt. ¶¶ 33-42))

Plaintiffs argue that "viewed in their totality," these facts make it plausible that Titus was engaged in deliberate or reckless illegal behavior. (Id. at 26) According to Plaintiffs, "Titus was in a position to know the true facts regarding the exorbitant valuation of PhytoSphere, yet repeatedly issued statements touting the benefits and value of the PhytoSphere deal." (Pltf.

Opp. (Dkt. No. 111) at 26) But Titus's control over the statements of Medical Marijuana, Inc. does not demonstrate his involvement in CannaVest's material misstatements and omissions, and Plaintiffs have not pled facts sufficient to demonstrate that Titus was involved in CannaVest's misstatements and omissions.

Nor do Titus's stock sales demonstrate his "culpable participation." As discussed above, "unusual or suspicious" trading activity may support an inference of scienter. Here, however, Plaintiffs have shown only that Titus sold 10% of his CannaVest shares between January 2013 and March 2013. (Pltf. Opp. (Dkt. No. 111) at 28-29 (citing Federman Decl., Exs. 1 & 2 (Dkt. Nos. 112-1, 112-2)) Standing alone, this evidence is insufficient to demonstrate suspicious or unusual trading behavior. See In re Prestige Brands Holding, Inc., 5 Civ. 6924 (CLB), 2006 WL 2147719, at * 5 (S.D.N.Y. July 10, 2006) ("[W]here each Defendant retained over 80% of the stock that he owned, Plaintiffs[] failed to demonstrate that the stock sales were suspicious and unusual. . . .").

District courts in this Circuit disagree, however, as to whether this third element of a Section 20(a) claim must be pled. See Special Situations Fund III, 33 F. Supp. 3d. at 437-38 (S.D.N.Y. 2014) ("[D]istrict courts within the Second Circuit disagree on the question of whether Section 20(a) plaintiffs must also allege 'culpable participation' as a third element of their claim. . . ."). ATSI Communications and many other Second Circuit cases include this third requirement as an element of Plaintiff's prima facie case, however. See, e.g., ATSI Communications, 493 F.3d at 108; SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996) ("In order to establish a prima facie case of controlling-person liability, a plaintiff must show . . . that the controlling person was 'in some meaningful sense [a] culpable participant[] in the fraud perpetrated by [the] controlled person[].'" (quoting Gordon v. Burr, 506 F.2d 1080,

1085 (2d Cir. 1974) (internal quotation omitted))); see also In re Scholastic Corp. Sec. Litig, 252

F.3d 63, 77 (2d Cir. 2001) ("A plaintiff may allege a primary § 10(b) violation by a person

controlled by the defendant, and culpable participation by the defendant in the perpetration of the

fraud."); Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir.

2001) ("Controlling-person liability is a form of secondary liability, under which a plaintiff may

allege a primary § 10(b) violation by a person controlled by the defendant and culpable

participation by the defendant in the perpetration of the fraud."); Ganino v. Citizens Utilities Co.,

228 F.3d 154, 170 (2d Cir. 2000) ("To make out a prima facie case under § 20(a) . . . a plaintiff

'must . . . show that the controlling person was in some meaningful sense a culpable participant

in the fraud perpetrated by the controlled person.'" (quoting First Jersey, 101 F.3d at 1472));

Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998) ("In order to establish a prima facie

case of liability under § 20(a), a plaintiff must show . . . 'that the controlling person was in some

meaningful sense a culpable participant' in the primary violation." (quoting First Jersey, 101

F.3d at 1472)). Accordingly, this Court concludes that "culpable participation" is a required

element of a Section 20(a) claim.[12]

   Accordingly, Titus's motion to dismiss the Section 20(a) claim against him will

be granted. The CannaVest Defendants' motion to dismiss Plaintiffs' Section 20(a) claim is

granted as to Sobieski, but will otherwise be denied.

---

[12] This Court thus disagrees with the reasoning in In re BISYS Sec. Litig., 397 F. Supp. 2d 430,
450-51 (S.D.N.Y. 2005) and In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 307-10 (S.D.N.Y.
2005). This Court does not regard as mere dictum the Second Circuit's statement in First Jersey
that "culpable participation" is part of plaintiff's prima facie case for purposes of establishing a
Section 20(a) claim. See In re Parmalat, 375 F. Supp. 2d at 309 ("[T]he broad language to the
effect that culpable participation is an element of a Section 20(a) plaintiff's prima facie case was
a loosely stated dictum.")

## V.    LEAVE TO AMEND

Plaintiffs have requested leave to amend in the event that this Court dismisses all or part of the Consolidated Complaint. (Pltf. Opp. (Dkt. No. 79) at 32) "[I]t is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiff leave to file an amended complaint." Van Buskirk v. N.Y. Times Co., 325 F.3d 87, 91 (2d Cir. 2003) (citing Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)). "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." Jin v. Metro. Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002).

Here, Defendants have not pointed to any compelling reason why leave to amend should be denied. Accordingly, Plaintiffs are granted leave to amend. Any Amended Consolidated Complaint will be filed by **April 15, 2018**.

## CONCLUSION

Defendants' motions to dismiss Plaintiffs' Section 10(b) and Rule 10b-5 claims are granted as to Plaintiffs' (1) market manipulation claim and (2) material misstatements or omissions claim as against Mackay, Sobieski, and Titus. Defendants' motions to dismiss Plaintiffs' misstatements and omissions claim are otherwise denied. Defendants' motions to dismiss Plaintiffs' Section 20(a) claim are granted as to Titus and Sobieski, but are otherwise denied. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 81, 108).

Dated: New York, New York
       March 31, 2018                    SO ORDERED.

_____
Paul G. Gardephe
United States District Judge